# EXHIBIT A

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

Alex E. Rogers, Esq. (PA ID #71043)
425 New Commerce Boulevard
Wilkes-Barre, PA 18706
P: 570-262-8250
E-mail: arogers@bedwickandjones.com
*Counsel for Plaintiffs*

Personally Served
052126

**THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PA**
**CIVIL ACTION-LAW**

| | |
|---|---|
| Daniel McAuley, Jr., H. Edward Carr, James Oestreich, and Tigran Kalaydzhyan, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Pathward, National Association, f/k/a MetaBank<br><br>Defendant. | Case No.<br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT

Plaintiffs Daniel McAuley, Jr., H. Edward Carr, James Oestreich, and Tigran Kalaydzhyan, individually and on behalf of all others similarly situated, by and through their attorneys, bring this Class Action Complaint against Pathward National Association. Plaintiffs allege as follows:

## INTRODUCTORY STATEMENT

1. This case concerns a $700,000,000 Ponzi scheme spearheaded by Paramount Management Group, LLC ('Paramount') and its leader, Daryl Heller ('Heller') .

2. Paramount represented that it raised money from retail investors to procure and operate a network of automated teller machines ("ATMs") and that ATM revenues would fund fixed monthly returns to investors.

3. Paramount's capital-raising efforts ran through a series of investment vehicles referred to herein as the 'Prestige Funds ."

4. From inception, Paramount and Heller were responsible for implementation of the Prestige Funds' investment model, including ATM acquisition, ATM deployment and maintenance, revenue generation, and cash-flow management. Paramount was the centralized operator of the business.

5. In that capacity, Paramount purported to manage a portfolio of approximately 38,000 ATMs. In reality, Paramount operated fewer than 10,000 ATMs, many of which were not even deployed, sitting idle in warehouses.

6. The vast majority of ATMs that Paramount and Heller claimed to own and operate either (1) never existed, (2) were purchased but stayed in a warehouse, (3) were sold to more than one entity, and/or (4) were not purchased outright.

7. Lacking meaningful cash flow from operations, Paramount relied on a constant influx of new investor money to make payments to existing investors.

8. Ultimately, the Ponzi scheme collapsed. Paramount ceased making monthly payments to investors in or around mid-2024, Heller's home was raided by FBI agents in December 2024, and Heller filed for Chapter 11 bankruptcy in February 2025 estimating his liabilities to be between $100,000,001 and $500,000,000.

9. The victims of Paramount's Ponzi scheme were individuals and entities who invested through the Prestige Funds. Those investors have lost their principal investments and have not received their promised monthly distributions since mid-2024.

10. Paramount and Heller could not have carried out this massive Ponzi scheme without substantial assistance from Defendant Pathward, National Association f/k/a MetaBank

("Pathward"). Pathward served as the "sponsor bank" for Paramount's ATM network beginning in 2017. In that role, Pathward enabled Paramount to access ATM networks and facilitated the routing, processing, and settlement of ATM transactions, in exchange for which Pathward earned lucrative fees.

11. As Paramount's sponsor bank, Pathward also undertook ongoing monitoring, due diligence, and compliance functions with respect to Paramount's ATM operations, including, but not limited to, functions mandated by the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), the Federal Reserve, the Bank Service Company Act ("BSCA"), and the Bank Secrecy Act ("BSA").

12. Such obligations included, but were not limited to, anti-money laundering ("AML") monitoring and reporting obligations and requirements that Pathward "know its customer" ("know your customer" referred to as "KYC" herein). In connection therewith, Pathward monitored and obtained information about Paramount's business operations as described in greater detail herein.

13. Through its performance of these obligations, Pathward created and disseminated investor-facing letters and other representations stating that Paramount was in good standing, "regularly audited," subject to monitoring and review, and sufficiently reviewed from a financial-viability perspective such that Pathward could vouch for its soundness. Paramount used those representations to reassure current and prospective investors.

14. As a byproduct of these monitoring, due diligence, and financial review functions, Pathward was in possession of and reviewed information concerning Paramount's ATM terminal activity such as transaction reporting, source of funds providers, as well as Paramount's financial condition.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

15. As described herein, that information did not confirm Paramount's financial soundness or the size and profitability of its claimed ATM portfolio. Nonetheless, Pathward represented to investors and prospective investors in investor-facing letters that Paramount was in good standing, "regularly audited," subject to monitoring and review, and sufficiently reviewed from a financial-viability perspective such that Pathward could vouch for its soundness. Paramount used those representations to induce and reassure prospective and current investors.

16. Pathward's knowing and substantial assistance provided in its capacity as Paramount's sponsor bank thus allowed Paramount's Ponzi scheme to not only survive, but thrive .

**PARTIES AND RELEVANT NON-PARTIES**

17. Plaintiff Daniel McAuley, Jr. is an individual and resident of Massachusetts. Plaintiff McAuley invested in Prestige Funds' Series A offering promoted and operated by Paramount.

18. Plaintiff H. Edward Carr is an individual and resident of Lancaster County, Pennsylvania. Plaintiff Carr invested in Prestige Funds' Series B offering promoted and operated by Paramount.

19. Plaintiff James Oestreich is an individual and resident of Texas. Plaintiff Oestreich invested in Prestige Funds' Series D offering promoted and operated by Paramount.

20. Plaintiff Tigran Kalaydzhyan is an individual and United States citizen currently residing in Mexico. Plaintiff Kalaydzhyan invested in Prestige Funds' WF Velocity Series offering promoted and operated by Paramount.

21. Defendant Pathward, National Association f/k/a MetaBank (previously defined as 'Pathward') is a federally chartered national bank with a principal place of business located at 551 S. Broadband Lane, Sioux Falls, South Dakota 57108.

22. The nonparty 'Prestige Fund(s)" referred to in this complaint are the following funds:

a. Prestige Fund A LLC;
b. Prestige Fund A II LLC;
c. Prestige Fund A IV LLC;
d. Prestige Fund A V LLC;
e. Prestige Fund A VI LLC;
f. Prestige Fund A VII LLC;
g. Prestige Fund A IX LLC;
h. Prestige Fund B LLC;
i. Prestige Fund B BTM I LLC;
j. Prestige Fund B II LLC;
k. Prestige Fund B IV LLC;
l. Prestige Fund B V LLC;
m. Prestige Fund B VI LLC;
n. Prestige Fund B VII LLC;
o. Prestige Fund D LLC;
p. Prestige Fund D BTM I LLC;
q. Prestige Fund D III LLC;
r. Prestige Fund D IV LLC;
s. Prestige Fund D V LLC;
t. Prestige Fund D VI LLC;
u. Prestige Fund E I LLC;
v. WF Velocity Fund I LLC;
w. WF Velocity Fund IV LLC;
x. WF Velocity Fund V LLC;
y. WF Velocity Fund VI LLC; and
z. WF Velocity Fund VII LLC.

23. Each of the Prestige Funds was organized under the laws of Delaware and is headquartered at 415 North Prince Street, Suite 200, Lancaster, Pennsylvania 17603.

24. Non-party Paramount Management Group, LLC ('Paramount') was organized under the laws of Pennsylvania and headquartered at 415 North Prince Street, Suite 202, Lancaster, Pennsylvania 17603 (the same address, but a different office suite, as the Prestige Funds).

25. Non-party Daryl Heller ('Heller') , through Heller Capital Management, LLC, was the majority owner and control person of Paramount. Through Heller Capital Management, LLC and Heller Capital Group, LLC, Heller also controlled the Prestige Funds until November 2024.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

## JURISDICTION AND VENUE

26. This Court has original jurisdiction to hear this action under 42 Pa.C.S. § 931.

27. Under Pennsylvania Rule of Civil Procedure 2179, venue is proper in this Court because (1) the causes of action arose in Lancaster County, (2) a transaction or occurrence took place in Lancaster County out of which the causes of action arose, and (3) Pathward regularly conducted business in Pennsylvania through its role as sponsor bank for Paramount.

## FACTUAL ALLEGATIONS

### I. Paramount's fraud on Plaintiffs and the Class

#### A. Paramount's investment model as represented in the offering materials

28. Paramount misled Plaintiffs and the Class into believing that they were purchasing interests in investment vehicles (the Prestige Funds) that, through Paramount, would procure and manage ATMs. In reality, these investors were purchasing interests in a Ponzi scheme that operated under the guise of an investment in the ATM industry.

29. Paramount was headquartered in and operated out of Lancaster, Pennsylvania. Much of the solicitation activity used to raise money for Paramount, including developing offering materials and determining how and to whom those materials would be disseminated, occurred in Pennsylvania.

30. The Prestige Funds provided their investors with Private Placement Memorandums ('PPMs') that compiled information that Paramount had shared with the Prestige Funds about Paramount's business.

31. While separate PPMs were used for different Prestige Funds, the PPMs were substantively identical in all or nearly all material respects.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

32. The PPMs stated that payments from Paramount to the Prestige Funds – which would then be distributed to investors – constituted profits derived through the ownership and operation of ATMs. More specifically, the PPMs stated that distributions "derived from the operations of the Funds' ATMs" would be paid at approximately $1,081 per month for every $52,000 invested, omitting that at all times the Funds had insufficient ATM-derived revenue to support the promised distributions.

33. The investors did not realize that, in reality, the payments from Paramount were not truly profits generated by the ownership of ATMs. Instead, distributions to investors were funded via money raised from subsequent investors.

34. For all of these reasons, even the PPMs' core statement about the "intended business of the Fund-the purchase, operation, and maintenance of ATMs," was misleading. In short, the PPMs failed to disclose that investor distributions were being funded, at least in substantial part, by later investor money rather than ATM-derived revenue.

**B. <u>Very few ATMs were actually purchased with investor capital – which Paramount concealed from the Prestige Funds</u>**

35. Very little investor capital was ultimately used to purchase ATMs.

36. Since the Ponzi scheme collapsed, Paramount has revealed in court filings that it actually owned fewer than 10,000 ATMs, of which less than 1,000 were in operation, with thousands of ATMs sitting uninstalled in warehouses.

37. Because Paramount did not procure nearly enough ATMs to generate meaningful revenue, it did not generate sufficient cash flow from operations to distribute to investors.

38. Instead, Paramount relied on new investor capital to fund distributions to existing investors, in Ponzi-like fashion, and misappropriated investor capital to its principals, in particular, but without limitation, Heller and Paramount executive Randall Leaman.

39. During the entire relevant period, Paramount and Heller exercised control over the operational infrastructure on which the Prestige Funds depended, as well as the accounts through which investor funds were received and from which distributions were made. Paramount and Heller maintained control over the financial flows and the data reflecting those flows, including the information provided to the Prestige Funds and their managers regarding asset performance and revenue.

40. The Prestige Funds, on the other hand, did not exercise independent control over the underlying ATM operations or possess direct access to the transactional data necessary to verify Paramount's representations. Instead, they relied on Paramount for operational reporting, financial information, and representations concerning the performance of the business.

41. Paramount and Heller capitalized on their informational advantage to misrepresent the nature of the underlying operations and to conceal material facts, including the true source of investor distributions and the existence and performance of ATM assets. This control over both operations and information created a substantial asymmetry that prevented the Prestige Funds from independently verifying the accuracy of Paramount's representations during the relevant period.

42. The Prestige Funds' promoters became aware of irregularities in Paramount's operations only after the misrepresentations described herein began to unravel. Upon identifying those issues, the Prestige Funds sued Heller and took steps to remove Heller from positions of control and to assume direct oversight of the Prestige Funds.

43. Following that transition, the Prestige Funds' promoters undertook efforts to investigate the underlying transactions and to address the resulting harm, including pursuing recovery from responsible third parties. This transition marked a shift from reliance on

Paramount's and Heller's representations to active efforts to understand and remediate the consequences of Paramount's misconduct.

44. In connection with the litigation between the Prestige Funds and Paramount, the parties submitted stipulations about what certain of their employees, officers, and other witnesses would say if called to testify as live witnesses. These stipulations revealed that Paramount did not procure or own the ATMs they purported to possess:

45. For example, Leigh Danca ('Danca') was the Vice President of Information Systems at Paramount until at least December 2024. Danca's stipulated testimony was that she "was familiar with the ATM assets that Paramount managed, including the number of ATMs managed."

46. Danca's stipulated testimony stated that Paramount had never managed 38,000 ATMs for the Prestige Funds and that instead it managed only 8,000 ATMs for the Prestige Funds "at most."

47. Specifically, Danca's stipulated testimony was that "[d]uring [her] tenure at Paramount, she never saw 38,000 ATMs owned, managed, or otherwise on the Paramount network" and that "[a]t most, Paramount had 8,000 Paramount -owned ATMs that were on the network." Danca clarified that "Paramount -owned ATMs" included any ATMs owned by the Prestige Funds.

## C. **<u>The lack of an adequate and producing portfolio of ATMs led to substantial cash flow shortfalls</u>**

48. The court-appointed examiner (the 'Examiner') in Heller's bankruptcy conducted an examination into "the allegation that [Heller] operated a Ponzi scheme" reviewing, among other things, First National Bank monthly account statements for Paramount, Heller Capital Group, and Prestige Investment Group, LLC, profit reports, correspondence between Heller and Randall

Leaman, as well as conducting interviews of Heller and Prestige Fund managers/executives Jerry Hostetter, Matthew Eby, and others.

49. With respect to the ATMs themselves, the Examiner found that Paramount "should have been able to purchase roughly 33,898 ATMs with the $587,562,603 received from" the Prestige Funds from January 2021 through March 2025 (the Examiner's 'Review Period').

50. However, the Examiner found that "the highest single monthly ATM count reflected in the Gross Profit Reports was 17,179 in July 2023."

51. As for whether such deficient ATM holdings were sufficient to sustain Paramount's operations, including distributions to investors, the Examiner found that, during the Review Period, Paramount had just $38,162,066 in net operating cash, which was "insufficient to pay the aggregate $407,324,116 in distributions [Paramount] paid to Investors during the Review Period."

52. Moreover, the Examiner found that even Paramount's "$161,663,196 in *gross* receipts from ATM operations was insufficient to pay the $407,324,116 in returns to Investors during the Review Period."

53. Accordingly, the Examiner found "[w]ith no other available funds to pay returns to earlier Investors, [Paramount] necessarily used funds from subsequent Investors to pay returns owed to earlier Investors."

## II. Pathward's role in Paramount's operations and in Paramount's investor-facing representations

### A. <u>Pathward's role as "sponsor bank" included compliance analysis and on-going monitoring of Paramount's ATM operations</u>

54. As a non-bank company that conducted ATM operations, Paramount was considered an "Independent Sales Organization" ("ISO").

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

55. As an ISO, Paramount required the services of a sponsor bank to facilitate, among other things, engagement with payment networks, use of payment processors, routing of transactions, and settlement of funds. From as early as 2017 through December 2024, Pathward served as Paramount's sponsor bank. Without such sponsorship, Paramount could not have conducted any of its ATM business, let alone the magnitude of business it represented to investors.

56. As sponsor bank, Pathward was neither a passive participant in the relationship nor was Pathward's role merely ministerial. Rather, Pathward sponsored Paramount into multiple payment networks and maintained contractual authority to review, restrict, and terminate Paramount's activities conducted under such sponsorship.

57. Since as early as July 2020, the Pathward-Paramount relationship was governed by an ATM Sponsorship Agreement (the 'Sponsorship Agreement'). The Sponsorship Agreement obligated Paramount to provide Pathward with detailed ATM ownership, tax, and financial information, among other information, on an ongoing basis. Moreover, the Sponsorship Agreement provided for Pathward to conduct due diligence, including requesting documents from Paramount, conducting compliance reviews of Paramount, approving or denying Source of Funds Providers ('SOFPs') , deactivating terminals, and terminating the relationship if Paramount was out of compliance with the Sponsorship Agreement.

58. In connection with such due diligence, Pathward required Paramount to use "ATM Pass,"Pathward's internal system, to keep terminal records current, assign operators and SOFPs to terminals, and review processor and network assignments.

59. Through the ATM Pass system and the reporting it required, Pathward collected and reviewed information concerning terminal identity, terminal status, operator assignments, and source of funds assignments for the terminals operating under its sponsorship. For each terminal,

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

Pathward also required Paramount to designate an identified, Pathward-approved operator and Pathward-approved source of funds provider ('SOFP') . Pathward thus required terminal-level information concerning where terminals were located, who operated them, and who supplied the cash used in them.

60. Pathward further required Paramount to formally acknowledge Pathward's AML and Office of Foreign Assets Control ('OFAC') obligations and to submit to Pathward all information necessary for Pathward to conduct ongoing compliance reviews.

61. Consistent with the foregoing, Pathward treated its relationship with Paramount as a relationship requiring ongoing due diligence, financial review, and regulatory oversight of Paramount. Pathward held the authority to terminate the relationship if the required information was not provided or did not support Pathward's continued sponsorship.

62. In practice, Pathward implemented its required ongoing due diligence, review, and oversight functions. For example, Pathward obtained unaudited financial statements from Paramount and its affiliates including, but not limited to, Sharenet, LLC, as part of what it called 'hext review ." Pathward involved its 'Third Party Risk"department in such review.

63. Pathward also underwent recurring OCC examination of its ATM sponsorship, merchant acquiring, BSA, and AML functions. Pathward itself advised sponsorship partners in March 2024 that the OCC examination would include such testing functions.

64. In connection with the foregoing, Pathward collected information including terminal-level records, source of funds information, processor reporting, monthly transaction files, and financial statements that Pathward used to determine whether Paramount's ATM business was functioning as represented.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

65. Pathward also collected ATM transaction data that Pathward used to test whether Paramount's reported business activity matched reality. For example, Pathward received monthly ATM transaction reports in summary and terminal-level form from third-party processors such as financial services company Fiserv. Those reports reflected actual terminal activity including transaction counts and activity by network and terminal, as well as terminals showing no activity.

66. In practice, Pathward reviewed and analyzed the data it received from Paramount, Fiserv, and others. As an example, in April 2021, Pathward told Paramount that the information Paramount had provided was insufficient for Pathward to complete its internal audit and compliance functions. Pathward required Paramount to provide additional, more granular transaction-level data for its ATM terminals including, but not limited to, terminal IDs, network locations, transaction dates, times, and dollar amounts (down to the number of bills dispensed), terminal types and models, and whether each terminal dispensed cash.

**B. <u>Pathward's regulatory obligations as sponsor bank</u>**

67. Pathward's sponsorship of Paramount was subject to federal banking obligations, including the BSA and related anti-money laundering ("AML") requirements. Those obligations required Pathward to maintain systems to monitor transaction activity, identify suspicious patterns, and scrutinize high-risk third-party relationships such as ISO sponsorship arrangements.

68. Pursuant to the BSA, 31 U.S.C. § 5311 *et seq.* and its implementing regulations at 31 C.F.R. § 1020.210, Pathward was required to implement and maintain a written AML program that included, at minimum: (i) a system of internal controls to assure ongoing compliance; (ii) independent testing for compliance conducted by bank personnel or an outside party; (iii) designation of an individual responsible for coordinating and monitoring day-to-day compliance; (iv) training for appropriate personnel; and (v) appropriate risk-based procedures for ongoing

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

customer due diligence, including understanding the nature and purpose of customer relationships and conducting ongoing monitoring to identify and report suspicious transactions. These obligations applied in full to Pathward's ATM sponsorship activities with Paramount.

69. Moreover, Pathward's own policies and procedures~~in~~cluding Due Diligence Packets for Independent ATM Operators used in or around 2022 and 2024~~re~~quired sponsored entities such as Paramount to identify to Pathward its ATM operators and funding sources, acknowledge AML and OFAC obligations, and submit to periodic review.

### C. <u>Pathward's ongoing monitoring of Paramount's transaction reporting and knowledge of missing, inconsistent, and deficient data streams</u>

70. The data-reporting stream Paramount provided to Pathward was neither stable nor self-verifying—rather, it required constant oversight by Pathward.

71. Pathward actually conducted such oversight. Over a period of several years, Pathward repeatedly demanded missing monthly transaction files, delayed transmissions, corrected files, and explanations for different versions of the same monthly reports with conflicting records from Paramount. For example, in June and July 2021, Pathward reported that required Fiserv monthly files had not been received and demanded that they be sent or re-sent.

72. The July 2021 example was not an isolated incident. In March 2022, Pathward grew frustrated with Paramount's repeated failures to provide required monthly files and demanded them by a date and time certain. Paramount complied.

73. In August 2022, Pathward identified two versions of the same monthly file Pathward had already received. The two files reflected different records, and as such Pathward demanded that Paramount address the discrepancy and confirm which file was correct.

74. In March 2024, Pathward escalated a missing monthly file to Paramount, stating that the deficiency was affecting Pathward's billing and downstream processes.

75. Pathward closely reviewed the information Paramount provided and was aware of recurring breakdowns in the submissions of required data Pathward relied upon to monitor Paramount's ATM activity.

76. Notwithstanding these reporting gaps, the information Pathward received was sufficiently detailed to provide Pathward with a clear view of actual terminal activity. For instance, Pathward reviewed recurring monthly summary reports showing total transaction counts, as well as terminal-level reports showing activity by network and terminal — including terminals that displayed zero activity.

**D. <u>Pathward was knowingly ignorant of Paramount's provision of unverified source of funds and operator information in derogation of Pathward's own know your customer, due diligence, and compliance obligations</u>**

77. Pathward's Sponsorship Agreement and internal policies required that every Paramount terminal have its own identified operator and identified source of funds provider, *i.e.* the person or entity supplying the actual cash loaded into the ATM.

78. Communications to and from Pathward personnel reflect widespread gaps in this required data. For example, with respect to Paramount's 'Cypress Advantage" ATM portfolio, Pathward employee Sabrina Cummings admitted Paramount had not provided data sufficient to tie source of funds information to specific active terminals. Cummings described how 'we do not see cash loaders in our monthly file," and described the deficiency as affecting Federal Financial Institutions Examinations Council ('FFIEC') and quarterly reporting that was 'viewable by the OCC."

79. Other Pathward correspondence reflected similar concerns. In 2021, Pathward employee Amanda Sterud, involved in Pathward's ATM sponsorship program, acknowledged that Paramount's terminal, operator, and source of funds reporting 'has not always been adequately

enforced" by Pathward and that regulators were pressing Pathward to obtain and track such information.

80. Likewise, in June 2021 Pathward told Paramount that spreadsheets and reports provided by Paramount did not satisfy OCC and internal requirements for maintaining a comprehensive database of all ATMs, operators, and source of funds providers. Pathward demanded the missing information from Paramount and advised that Pathward would be running missing operators and SOFPs through underwriting.

81. Pathward's personnel were aware of the scale of these unresolved issues, which reached a head in June 2023 when Pathward's compliance personnel had to work with Paramount to go one by one through Pathward's database to obtain Federal Employer Identification Numbers ('FEINs') or social security numbers ('SSNs') for more than 1,100 missing SOFPs that had been assigned to Paramount terminal IDs. In doing so, Pathward acknowledged "current open internal findings" concerning the missing information.

82. In summary, through Pathward's sponsorship, due diligence, know your customer, and AML functions, Pathward collected and maintained detailed terminal, operator, and SOFP information. Pathward's correspondence confirms its knowledge that the information Paramount provided in connection therewith was incomplete and inaccurate.

### E. Pathward's review of Paramount's financial activity confirmed mismatches, portfolio irregularities, and account-level concerns

83. Pathward also reviewed Paramount's and Paramount's affiliates' actual financial activity on a monthly basis.

84. For example, in 2022 Pathward conducted a Sharenet, LLC "Exposure Limit Review" based on Paramount's January through June 2022 automated clearing house ("ACH") activity. Through this exercise, Pathward identified the highest debit file, highest credit file,

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

highest daily debit, and highest daily credit observed during that period. Based on this, Pathward recommended that Paramount's then-applicable credit and debit limits be adjusted to levels consistent with the activity Pathward had reviewed.

85. Pathward also tracked transaction volume and billing by entity within Paramount's portfolio. For example, in December 2022, Pathward asked Paramount why it was not seeing any transaction volume for First Regents Bancservices, LLC ('First Regents'), a separ ate company under Paramount's corporate umbrella, and whether those terminals were instead being processed under Paramount. Pathward then recognized that those transactions were appearing under Paramount and would need to be separated later so the volume and billing could be attributed to the correct entity.

86. Pathward's review of Paramount's financial activity went well beyond Paramount's transaction files. Pathward consistently requested Paramount's unaudited financial statements as part of 'hext review ," and those statements were reviewed through Pathward's Third Party Risk department. Pathward also located and resent prior financial submissions as a model for updated production, even while Paramount's own accounting personnel were internally questioning whether newer financials were accurate.

**F. <u>Pathward relationship manager Kerry Hamiel and Pathward's involvement in investor-facing communications and follow-up inquiries</u>**

87. Kerry Hamiel was a Pathward relationship manager and one of Paramount's primary day-to-day contacts at Pathward.

88. In that role, Hamiel communicated directly with Heller and Steven Gernes, Paramount's President and Chief Operating Officer.

89. Hamiel also communicated with third parties on Pathward's behalf concerning Paramount's status with the bank.

90. Hamiel coordinated and sent formal letters on Pathward's behalf that were used in connection with investor due diligence efforts.

91. In doing so, Hamiel allowed Paramount to dictate certain contents of these letters (some of which were to specific recipients, rather than 'to whom it may concern') including, critically, allowing Paramount to dictate language stating that Pathward had reviewed Paramount's financial viability and could "vouch for its soundness ."

92. When Paramount requested specific language, Hamiel revised her drafts accordingly. The revised letters stated that Paramount was in good standing and "is regularly audited by us" for compliance relating to ATM terminal operations. The letters further state d that Paramount was required to cooperate with Pathward's "initial due diligence and ongoing review process," that Pathward monitored ATM terminal activity, that Paramount was required to provide information regarding the source of currency funding for each ATM terminal, and that "Pathward has reviewed Paramount from a perspective of financial viability and can vouch for its soundness."

93. These statements were misleading. As set forth herein, Pathward was aware of operational, transactional, and financial inconsistencies, irregularities, and deficiencies in Paramount's business at the same time it was making those representations.

94. Moreover, Pathward stated in investor-facing sponsorship letters that Paramount was required to provide Pathward with "a quarterly listing of all ATM terminals, including address and terminal identification number of each location and the type of business where the terminal is located."

95. In reality, Pathward's internal correspondence reflected that Pathward was not adequately or accurately maintaining these categories of information or reliably enforcing Paramount's obligations to provide such information.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

96. Pathward was not merely lending its name and reputation to Paramount's investor communications without knowledge of the underlying circumstances. Rather, Pathward affirmatively required Paramount's quarterly terminal listings, terminal activity, and source of funds reporting as a stated condition of Pathward's sponsorship. Pathward knew Paramount was deficient in such respects and that Pathward was itself inadequately enforcing said requirements. Nonetheless, Pathward affirmatively, and repeatedly, represented to Paramount investors, directly and knowingly through intermediaries, that Paramount was "regularly audited," in good standing, and financially sound.

97. Pathward knew that its letters were directed to investors and other recipient-specific third parties rather than used solely for internal purposes. Its letters had already been requested and used in investor- and audit-related settings, including a February 2021 request for a refreshed, current-dated letter for an investor-side recipient.

98. By May and June 2023, Paramount was requesting letters for specifically identified investors and lenders. Hamiel sent those letters on Pathward's behalf.

99. Hamiel's role did not end once the letters were sent. By mid- to-late 2023, Pathward knew its letters had "made [their] way around to many individuals" and that investors were asking specific follow-up questions about what audits were performed and what Pathward's sponsor bank role actually entailed. Hamiel received many of these inquiries.

100. For example, one investor identified himself to Pathward as "actually an investor in their fund trying to do due diligence" and asked Pathward what its "financial viability" language meant, including whether Pathward had verified that funds were coming from real ATMs.

101. Another investor contacted Hamiel, stating he was considering investing and wanted to know what Pathward's exact role was, what diligence and oversight Pathward

performed, and what information Pathward could share about Paramount and the Prestige Funds to assess risk.

102. In another exchange, Daryl Heller himself asked Hamiel to respond directly to an investor, using the Pathward letter and related talking points to support Hamiel's response.

103. Pathward knowingly aligned with Paramount-coordinating directly with Heller for such purposes-to control and centrally manage such investor inquiries. Pathward knew inquiries were coming from investors, that Pathward's letters were being supplied in connection with active capital raising activities to fund "significant acquisition growth," and that its letters had been broadly circulated beyond their original recipients, yet Pathward continued to allow Paramount and Heller to use Pathward's representations in responding to investor diligence questions.

104. Pathward knew two things at the same time: first, that its own sponsorship, due diligence, KYC, AML, and financial review processes were revealing missing transaction files, incomplete source of funds and terminal assignments, unresolved reporting gaps, and financial information that Pathward was chronically trying to reconcile. Second, that the letters Pathward was issuing stated that Paramount was in good standing, regularly reviewed, and financially sound, and were being used in ongoing fundraising and investor diligence.

105. Pathward thus knew, through its own review processes, that it could not verify Paramount's claimed ATM network and financial soundness, yet Pathward issued investor-facing letters it knew were being used to solicit, reassure, and retain investors.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

### G. Despite Pathward's knowledge of Paramount's fundamental flaws, Pathward held the line on its sponsorship relationship with Paramount and investor-facing representations

106. While these reporting, source-of-funds, and financial-review deficiencies remained unresolved, Pathward continued to sponsor Paramount and its affiliates despite contractual authority to terminate the relationship. Likewise, Pathward continued to allow its 'good standing" and 'financial viability" letters to be circulated among investors.

107. Pathward chose not to suspend Paramount's participation in ATM networks and not to withdraw, correct, or otherwise intervene in circulation of its outstanding letters.

108. Pathward maintained this posture for years. By late August 2024, Pathward was aware of public reports that Paramount was involved in investor litigation and that it owed large sums to investors. Pathward merely asked Paramount for a response to such reports. When Paramount denied wrongdoing and characterized the matter as a dispute with investors, Pathward carried on its sponsor relationship despite its knowledge about Paramount's fundamental flaws.

109. Pathward finally terminated the sponsor relationship on December 18, 2024 after receiving a subpoena from the United States Securities and Exchange Commission, learning of a Federal Bureau of Investigation raid, and learning Paramount had been held in contempt in a civil proceeding in the preceding weeks.

110. Pathward-wh ich learned of such issues through means other than Paramount—terminated its sponsor relationship on grounds that Paramount failed to provide Pathward with required notice of such litigation and legal process.

### H. Summary of Pathward's Relationship with Paramount

111. Over the course of Pathward's sponsorship of Paramount, Pathward learned of widespread and systemic transactional, operational, and financial irregularities in Paramount's

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

business. In spite of this knowledge, Pathward continued its sponsor role and went as far as to affirmatively represent to Paramount investors that Paramount was in good standing and financially sound.

112. Pathward's affirmative representations concerning Paramount's status ~~in~~cluding letters describing Paramount as in "good standing," regularly audited, and financially sound addressed to Paramount investors and lenders ~~and~~ Pathward's continued sponsorship of Paramount were used by Paramount in communications with the Prestige Funds and to the Class.

113. Such conduct was material to investors' decisions to invest in, and remain invested in the Prestige Funds because it reinforced the core representation that Paramount was successfully implementing the business model it purported to investors: that it was operating a large, profitable ATM portfolio that generated sufficient revenue to fund investor distributions.

114. By early-to-mid 2023, Paramount and its affiliates were incorporating Pathward's sponsorship and "good standing" letters directly into investor diligence materials distributed to current and prospective investors. Those materials described Pathward's represented review, due-diligence, monitoring, and audit functions as part of investor diligence and were intended to be reviewed and relied upon by investors.

115. Had Pathward not issued or allowed the circulation of letters and representations describing Paramount as in "good standing," regularly audited, and financially sound in light of known reporting, source-of-funds, and financial-review deficiencies, Plaintiffs and the Class would not have invested in or remained invested in the Prestige Funds operated by Paramount. Likewise, had Pathward terminated its sponsor relationship based upon such knowledge, Plaintiffs and the Class would not have invested in or remained invested in the Prestige Funds operated by Paramount.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

116. Pathward's letters, affirmative representations to investors, and continued sponsorship thus served as a critical component in the misrepresentations that induced and sustained Plaintiffs' and the Class' investments in Paramount's and Heller's Ponzi scheme.

117. Pathward's conduct lent legitimacy to Paramount's otherwise fraudulent ATM operations.

118. Paramount's operations depended on continued access to ATM networks and transaction processing infrastructure provided by its sponsor bank, Pathward.

119. As such, Pathward knowingly and substantially assisted Paramount's and Heller's perpetration of their Ponzi scheme and caused Plaintiffs and the Class to suffer losses of their principal investments and promised distributions.

## III. Plaintiffs' Investments

### A. Plaintiff Daniel McAuley, Jr.

120. In or around November 2020, Plaintiff McAuley invested $104,000 in Prestige Funds' Series A offering.

121. The representations this specific Prestige Fund made to Plaintiff McAuley were largely no different than those made by the other Prestige Funds including, but not limited to: that (1) Prestige Funds would use investor capital to purchase ATMs from Paramount; (2) Paramount would manage those ATMs to generate revenue; (3) Paramount would collect revenue from the ATMs and pay a fixed monthly sum to Prestige Funds; (4) Prestige Funds would distribute the money earned to their investors.[1]

[1] To be sure, there is a technical difference between, on the one hand, the 'Prestige Fund A" series of investments, and on the other hand, most (if not all) of the other Prestige Funds: the Prestige Fund A series' offering documents purported to offer investors direct ownership in the ATMs, rather than simply ownership in the Prestige Funds. In practice, however, this technical difference has little consequence because the parties' rights and obligations to one another remained the same.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

122. Plaintiff McAuley invested a total of $104,000 in Prestige Funds' Series A offering.

**B. <u>Plaintiff H. Edward Carr</u>**

123. In or around February 2024, Plaintiff Carr invested $208,000 in Prestige Funds' Series B offering.

124. The representations this specific Prestige Fund made to Plaintiff Carr were largely no different than those made by the other Prestige Funds including, but not limited to: that (1) Prestige Funds would use investor capital to purchase ATMs from Paramount; (2) Paramount would manage those ATMs to generate revenue; (3) Paramount would collect revenue from the ATMs and pay a fixed monthly sum to Prestige Funds; (4) Prestige Funds would distribute the money earned to their investors.

125. Plaintiff Carr invested a total of $208,000 in Prestige Funds' Series B offering.

**C. <u>Plaintiff James Oestreich</u>**

126. From August 2021 through October 2023, Plaintiff Oestreich invested a total of $312,000 in Prestige Funds' Series D offering.

127. The representations this specific Prestige Fund made to Plaintiff Oestreich were largely no different than those made by the other Prestige Funds including, but not limited to: that (1) Prestige Funds would use investor capital to purchase ATMs from Paramount; (2) Paramount would manage those ATMs to generate revenue; (3) Paramount would collect revenue from the ATMs and pay a fixed monthly sum to Prestige Funds; (4) Prestige Funds would distribute the money earned to their investors.

128. Plaintiff Oestreich invested a total of $312,000 in Prestige Funds' Series D offering.

### D. Plaintiff Tigran Kalaydzhyan

129. In July 2023, Plaintiff Kalaydzhyan invested a total of $52,000 in the Prestige Funds' WF Velocity Series offering.

130. The representations this specific Prestige Fund made to Plaintiff Kalaydzhyan were largely no different than those made by the other Prestige Funds including, but not limited to: that (1) Prestige Funds would use investor capital to purchase ATMs from Paramount; (2) Paramount would manage those ATMs to generate revenue; (3) Paramount would collect revenue from the ATMs and pay a fixed monthly sum to Prestige Funds; (4) Prestige Funds would distribute the money earned to their investors.

131. Plaintiff Kalaydzhyan invested a total of $52,000 in Prestige Funds' WF Velocity Series offering.

### E. Allegations common to all Plaintiffs

132. In or around mid-2024, the Ponzi scheme collapsed because Paramount ran out of money to continue operating and funding Ponzi payments to investors.

133. In the months that followed, Heller stalled and delayed payment to investors and Paramount and the Prestige Funds, who shared common ownership, began infighting, trying to blame one another for the businesses' collapse.

134. Unfortunately, Plaintiffs and the Class have not received monthly payments since approximately mid-2024 and Plaintiffs and the Class have suffered losses including the loss of principal and the cessation of promised monthly distributions.

## CLASS ACTION ALLEGATIONS

135. Plaintiffs bring this action against Defendant pursuant to Rules 1702 *et seq.* of the Pennsylvania Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. The Class which the Plaintiffs seek to represent is comprised of all persons who:

a. Purchased interests in Prestige Funds;

b. Did not make a net profit on their investments; and

c. Have never been owners, employees, legal representatives, or successors of Paramount.

(the 'Class Definition').

136. Plaintiffs reserve the right to amend this Complaint to assert claims on behalf of additional classes or subclasses of investors in any of the Prestige Funds as may later become necessary, insofar as the misrepresentations and omissions identified in this complaint were common to all Prestige Fund offerings.

137. **<u>Numerosity:</u>** Approximately 2,700 individuals or entities fall within the proposed Class Definition. As a result, a class action is superior to other methods of adjudicating the claims of the putative class members; litigating their claims individually would be impractical. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party defending the claims.

138. The claims of Plaintiffs are typical of the claims of the class it seeks to represent. Plaintiffs and other class members invested in one or more of the Prestige Funds during the relevant time period. All of their purchases were based on the same set of offering documents and other

information made available by the Prestige Funds and their affiliates. A material misrepresentation or omission to one investor is thus the same for all investors.

139. **Commonality:** There are well-defined, nearly identical issues common to the Class ~~which~~ predominate over issues not common to the C lass ~~in~~cluding:

a. Whether Paramount operated a Ponzi scheme;

b. Whether certain representations common across the Prestige Funds offerings including but not limited to the list below were false and misleading;

1. the Prestige Funds could generate double-digit annualized returns;

2. the Prestige Funds would use investors' capital to purchase as many ATMs as possible;

3. investors would receive returns comprised of revenue from ATMs; and

4. Paramount would only realize income for its services as described in the PPMs.

c. Whether the misleading statements made by the Prestige Funds as controlled by Paramount and/or Heller were material;

d. Whether the misrepresentations and omissions of the Prestige Funds, as controlled by Paramount and/or Heller ~~such~~ as that the Prestige Fund investments were profitable ~~were~~ relied upon by any individual who purchased those investments;

e. Whether Pathward knew that the representations common among the Prestige Funds as controlled by Paramount and/or Heller were false and/or misleading;

f. Whether Pathward had statutory responsibility to monitor and oversee ATM operations by Paramount;

g. Whether Pathward issued or allowed the circulation of investor-facing letters and related representations that aided Paramount and Heller in misleading investors;

h. Whether Pathward had knowledge of the Ponzi scheme operated by Paramount and/or Heller; and

i. Whether Pathward aided or assisted Paramount and/or Heller, via the Prestige Funds, in operating a Ponzi scheme.

140. These and other common issues predominate over any individual issues. The focus of these claims is on the conduct of Pathward and the contents of its knowledge of and assistance to Paramount and/or Heller, which did not vary as between class members.

141. Resolution of these common questions will drive the claims of all class members toward judgment or resolution; they involve a 'fatal similarity" for purposes of the claims of all class members.

142. For all of these reasons, a class action is the superior method for the fair and efficient adjudication of this controversy.

143. **Typicality:** Like all of the proposed class members, Plaintiffs seek to recover the financial losses they suffered because of Pathward's aid to the Paramount Ponzi scheme regarding their investment.

144. **Adequacy of representation:** Plaintiffs are members of the class and will fairly and adequately represent and protect its interests. Plaintiffs have no interests contrary to or in conflict with the interests of other class members.

145. Counsel for Plaintiffs are competent and experienced attorneys who have particular experience in litigating class action claims.

146. **Fair and efficient method:** Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications and would be an inefficient method to prosecute these claims with the potential for thousands of individual claims.

Additionally, a consistent adjudication for all members of the class would provide a basis for fair and equitable adjudication for all members of the class.

147. Further, adjudications with respect to individual class members would, as a practical matter, substantially impair the ability of other members to protect their interests because of the limited assets that may be available to remedy harms done to Plaintiffs in this case.

148. Class-wide relief is essential to resolve the claims regarding all potential investors relating to all responsible parties in an equitable, even-handed fashion.

149. Plaintiffs therefore seek certification of the class(es) pursuant to Rule 1702 of the Pennsylvania Rules of Civil Procedure.

## CAUSES OF ACTION

### Count I
### Aiding and Abetting Fraud

150. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

151. To establish a claim for aiding and abetting fraud under Pennsylvania law, a plaintiff must demonstrate: (1) fraud committed by a third party, (2) actual knowledge of the fraud, and (3) substantial assistance or encouragement. Actual knowledge may be inferred from circumstantial evidence and does not require proof that the aider knew every detail or the full legal significance of the fraud. Plaintiffs' Complaint satisfies each element.

***The existence of an underlying fraud***

152. Paramount and its principal, Heller, perpetrated a massive Ponzi scheme through the Prestige Funds. As set forth herein, from 2012 through 2024, Paramount and Heller raised over $700,000,000 from approximately 2,700 investors through material misrepresentations and

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

omissions concerning the acquisition, operation, profitability, and cash-generating capacity of Paramount's ATM portfolio.

153. Paramount operated far fewer ATMs than represented. Paramount purported to manage a portfolio of approximately 38,000 ATMs, but in reality owned fewer than 10,000, many of which were sitting idle in warehouses and not generating revenue. The court-appointed Examiner in Heller's bankruptcy found that Paramount's gross receipts from ATM operations during the Review Period were just $161,663,196-grossly insufficient to support the $407,324,116 in distributions Paramount paid to investors during the same period. Paramount's net operating cash was a mere $38,162,066.

154. Lacking sufficient revenue from operations, Paramount relied on new investor capital to fund distributions to existing investors in classic Ponzi fashion, and misappropriated investor capital to its principals, including Heller. The Examiner concluded that '[w]ith no other available funds to pay returns to earlier Investors, [Paramount] necessarily used funds from subsequent Investors to pay returns owed to earlier Investors."

155. The PPMs provided to Plaintiffs and the Class contained material misrepresentations and omissions including that investor capital would be used to purchase ATMs, that monthly distributions would be derived from ATM revenue, and that Paramount would use the entirety of investor proceeds to identify, acquire, manage, operate, and maintain ATMs. None of these representations were true. The underlying fraud is clear.

***Pathward's knowledge of the underlying fraud***

156. Pathward served as Paramount's sponsor bank from at least 2017 through December 2024, enabling Paramount to access ATM networks and facilitating the routing, processing, and settlement of ATM transactions. Under the Sponsorship Agreement and

Pathward's ongoing sponsorship relationship with Paramount, Paramount was required to provide detailed terminal-level data, ownership information, financial records, and identification of the source of funds used to supply ATM cash on a terminal-by-terminal basis.

157. Through its sponsorship role and ongoing monitoring, Pathward had direct access to transaction data reflecting the number of active ATMs, the volume and frequency of transactions at each terminal, and the revenue generated by Paramount's ATM portfolio. Pathward used that information in monitoring Paramount's ATM activity, and the data did not confirm the ATM business and financial soundness Pathward represented to investors and investor-side intermediaries.

158. Pathward's own compliance framework required it to collect and evaluate voluminous data from Paramount concerning terminal activity, transaction reporting, source of funds assignments, and financial condition. Through those processes, Pathward encountered:

a. Missing and delayed transaction data;

b. Substantial gaps in source of funds tracking;

c. Irregularities in transaction settlements; and

d. Discrepancies in Paramount's financials, which Pathward repeatedly tried to reconcile.

159. By July 2023, Pathward was aware that its sponsorship and 'good standing" letters were being circulated to, and relied upon by, investors. At that time, Pathward was receiving inquiries from individuals identifying themselves as investors or prospective investors who had obtained copies of Pathward's letters and were seeking additional information regarding Paramount. Despite that awareness, Pathward did not withdraw, retract, or correct its representations.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

160. These conditions gave rise to Pathward's actual knowledge of facts making Paramount's investor-facing conduct wrongful. Pathward knew it could not verify Paramount's claimed ATM network and financial soundness through its own review processes, while standing behind Paramount in letters it knew were being used in investor diligence and active fundraising.

***Pathward's substantial assistance in perpetrating the fraud***

161. Pathward provided substantial assistance to Paramount's Ponzi scheme in a variety of ways:

a. Paramount's operations depended entirely on continued access to ATM networks and transaction processing infrastructure provided by its sponsorship bank. Without Pathward's sponsorship, Paramount could not have accessed the Visa, Mastercard, and other banking networks necessary to process ATM transactions. Pathward's continued sponsorship from 2017 through December 2024 provided the critical operational infrastructure upon which the Ponzi scheme depended.

b. Pathward issued investor-facing letters and related representations stating that Paramount was in good standing, "regularly audited," subject to ongoing due diligence and monitoring, and sufficiently reviewed from a financial-viability perspective such that Pathward could vouch for its soundness. Those representations lent Paramount credibility in soliciting and retaining investor capital.

c. By May and June 2023, Paramount and its affiliates incorporated Pathward's sponsorship and "good standing" letters directly into investor diligence materials that were distributed to existing and prospective investors.

d. Pathward retained authority under the Sponsorship Agreement to review, restrict, deactivate terminals, or terminate Paramount's access to ATM networks. Despite its knowledge of missing transaction data, incomplete source-of-funds information, settlement irregularities, and transaction volumes grossly inconsistent with Paramount's claimed portfolio over a period of years, Pathward did not terminate its relationship with Paramount until December 2024—and at the time did so only after receiving information concerning a federal investigation, including a subpoena and related enforcement activity.

***Causation and damages***

162. Pathward's substantial assistance was a direct and proximate cause of Plaintiffs' and the Class' damages. Without Pathward's continued sponsorship, Paramount could not have accessed the ATM networks necessary to maintain the appearance of legitimate operations. Without Pathward's letters and affirmative representations that Paramount was in good standing, regularly reviewed, and financially sound, Paramount would not have been able to maintain the credibility necessary to continue soliciting investor capital. Investors reasonably understood that a sponsor bank subject to federal oversight and compliance requirements would not associate itself with an ATM operation that was fraudulent.

163. Had Pathward refused to issue or allow circulation of letters stating that Paramount was in good standing, regularly audited, and financially sound in light of the known reporting, source-of-funds, and financial-review deficiencies, or had Pathward terminated its sponsorship relationship upon encountering such issues, Plaintiffs and the Class would not have invested in or maintained their investments.

164. As a direct and proximate result of Pathward's aiding and abetting Paramount's and Heller's fraud, Plaintiffs and the Class have suffered damages, including the loss of their principal investments and the cessation of promised monthly distributions since approximately mid-2024.

**<u>Count II</u>**
**Aiding and Abetting Breach of Fiduciary Duty**

165. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

166. To establish a claim for aiding and abetting breach of fiduciary duty, a plaintiff must demonstrate: (1) the existence of a fiduciary relationship and a breach of a fiduciary duty

owed to the plaintiff; (2) the defendant's actual knowledge of the breach of fiduciary duty; and (3) the defendant's substantial assistance in effecting the breach. Actual knowledge may be inferred from circumstantial evidence and does not require proof that the aider knew every detail or the full legal significance of the breach. Plaintiffs' Complaint satisfies each element.

***The existence of a fiduciary relationship and breach of fiduciary duty***

167. Paramount and its principal, Heller, controlled the Prestige Funds and the ATM operations in which Plaintiffs and the Class invested. In such capacity, Paramount and Heller owed fiduciary duties to Plaintiffs and the Class, including duties of loyalty, care, and candor.

168. As fiduciaries, Paramount and Heller were obligated to manage the Prestige Funds in the best interests of investors, to use investor capital for its stated purposes, to make full and fair disclosures regarding the operations and financial condition of Paramount and the Prestige Funds, and to refrain from self-dealing and misappropriation.

169. Paramount and Heller breached those fiduciary duties.

170. Rather than deploying investor capital to acquire and operate ATMs as represented, Paramount operated far fewer ATMs than claimed—fewer than 10,000 compared to the approximately 38,000 represented to investors—and many of those machines sat idle in warehouses and were not generating revenue. The court-appointed Examiner in Heller's bankruptcy found that Paramount's gross receipts from ATM operations during the Review Period were just $161,663,196, grossly insufficient to support the $407,324,116 in distributions Paramount paid to investors during the same period.

171. Rather than funding investor distributions from legitimate ATM revenue, Paramount used new investor capital to pay returns to existing investors in classic Ponzi fashion. Paramount and Heller misappropriated investor funds for personal use and to enrich insiders. The

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

Examiner concluded that '[w]ith no other available funds to pay returns to earlier Investors, [Paramount] necessarily used funds from subsequent Investors to pay returns owed to earlier Investors."

172. Paramount and Heller also breached their duty of candor by providing Plaintiffs and the Class with PPMs containing material misrepresentations and omissions, including that investor capital would be used to purchase ATMs, that monthly distributions would be derived from ATM revenue, and that Paramount would use the entirety of investor proceeds to identify, acquire, manage, operate, and maintain ATMs. None of these representations were true, amounting to a direct breach of fiduciary duties.

***Pathward's knowledge of the breach of fiduciary duty***

173. Pathward served as Paramount's sponsor bank from at least 2017 through December 2024, enabling Paramount to access ATM networks and facilitating the routing, processing, and settlement of ATM transactions. Under that relationship, Paramount was required to provide detailed terminal-level data, ownership information, financial records, and identification of the source of funds used to supply ATM cash on a terminal-by-terminal basis.

174. Through its sponsorship role and ongoing monitoring, Pathward had direct access to transaction data reflecting the number of active terminals, the volume and frequency of transactions at those terminals, and the revenue generated by Paramount's purported ATM portfolio. That data did not confirm the ATM business and financial soundness Pathward stood behind in its investor-facing communications.

175. Pathward's own compliance framework required it to collect and evaluate voluminous data from Paramount concerning terminal activity, transaction reporting, source of funds assignments, and financial condition. Through those processes, Pathward encountered:

a. Missing and delayed transaction data;

b. Substantial gaps in source of funds tracking;

c. Irregularities in transaction settlements; and

d. Discrepancies in Paramount's financials, which Pathward repeatedly tried to reconcile.

176. By July 2023, Pathward was aware that its sponsorship and 'good standing" letters were being circulated to, and relied upon by, investors. At that time, Pathward was receiving inquiries from individuals identifying themselves as investors or prospective investors who had obtained copies of Pathward's letters and were seeking additional information regarding Paramount. Despite that awareness, Pathward did not withdraw, retract, or correct its representations.

177. These conditions gave rise to Pathward's actual knowledge of facts making Paramount's and Heller's breaches of fiduciary duty wrongful. Pathward knew it could not verify Paramount's claimed ATM network and financial soundness through its own review processes, while standing behind Paramount in letters it knew were being used in investor diligence and active fundraising.

***Pathward's substantial assistance in Paramount's breach of fiduciary duty***

178. Pathward substantially assisted Paramount's and Heller's breaches of fiduciary duty in the following ways:

a. Paramount's operations depended entirely on continued access to ATM networks and transaction processing infrastructure provided by its sponsorship bank. Without Pathward's sponsorship, Paramount could not have accessed the Visa, Mastercard, and other banking networks necessary to process ATM transactions. Pathward's continued sponsorship from 2017 through December 2024 provided the critical operational infrastructure upon which the Ponzi scheme depended.

b. Pathward issued investor-facing letters and related representations stating that Paramount was in good standing, "regularly audited," subject to ongoing due diligence and monitoring, and sufficiently reviewed from a financial-viability perspective such that Pathward could vouch for its soundness. Those representations lent Paramount credibility in soliciting and retaining investor capital.

c. By May and June 2023, Paramount and its affiliates incorporated Pathward's sponsorship and "good standing" letters directly into investor diligence materials that were distributed to existing and prospective investors.

d. Pathward retained authority under the Sponsorship Agreement to review, restrict, deactivate terminals, or terminate Paramount's access to ATM networks. Despite its knowledge of missing transaction data, incomplete source-of-funds information, settlement irregularities, and transaction volumes grossly inconsistent with Paramount's claimed portfolio over a period of years, Pathward did not terminate its relationship with Paramount until December 2024—and at the time did so only after receiving information concerning a federal investigation, including a subpoena and related enforcement activity.

***Causation and damages***

179. Pathward's substantial assistance was a proximate cause of Plaintiffs' and the Class' damages. Without Pathward's continued sponsorship, Paramount could not have accessed the ATM networks necessary to maintain the appearance of legitimate operations. Without Pathward's letters and affirmative representations that Paramount was in good standing, regularly reviewed, and financially sound, Paramount would not have been able to maintain the credibility necessary to continue soliciting investor capital.

180. Had Pathward refused to issue or allow the circulation of letters stating that Paramount was in good standing, regularly audited, and financially sound in light of the known reporting, source-of-funds, and financial-review deficiencies, or had Pathward terminated its sponsorship relationship upon encountering such issues, Plaintiffs and the Class would not have invested in or maintained their investments.

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

181. As a direct and proximate result of Pathward's aiding and abetting Paramount's and Heller's breach of fiduciary duty, Plaintiffs and the Class have suffered damages, including the loss of their principal investments and the cessation of promised monthly distributions since approximately mid-2024.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendant as follows:

a. Entering judgment that Pathward is liable for aiding and abetting Paramount's and Heller's fraud, breaches of fiduciary duty, and other wrongful conduct alleged herein;

b. Awarding compensatory damages in an amount to be proven at trial, including all investment losses, lost distributions, and other damages suffered by Plaintiffs and members of the Class;

c. Awarding restitution and disgorgement of all profits, fees, and other compensation received by Pathward in connection with its sponsorship of Paramount;

d. Pre-judgment and post-judgment interest as allowed by law; and

e. Such other and further relief as this Court deems just and equitable.

**ALEX ROGERS LAW**

BY: *\/s/Alex Rogers*
Alex E. Rogers, Esquire
(PA ID #71043)
425 New Commerce Boulevard
Wilkes-Barre, PA 18706
Phone: 570-262-8250
Email: arogers@bedwickandjones.com

Daniel Centner (will seek *pro hac vice*)
**PEIFFER WOLF CARR KANE CONWAY & WISE LLP**
935 Gravier Street
New Orleans LA 70112
504-605-2234
dcentner@peifferwolf.com

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

Jason J. Kane (will seek *pro hac vice*)
**PEIFFER WOLF CARR KANE CONWAY & WISE LLP**
160 Linden Oaks
Rochester New York 14625
585-310-5140
jkane@peifferwolf.com

Nico Banks (will seek *pro hac vice*)
**BANKS LAW OFFICE**
1121 SE Sherman St., Unit A
Portland, OR 97214
(T) 971-678-0036
nico@bankslawoffice.com

Scott Silver (will seek *pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
(T) 954-755-4799
ssilver@silverlaw.com

Ryan Schwamm (will seek *pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
(T) 954-755-4799
rschwamm@silverlaw.com

Peter Spett (will seek *pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
(T) 954-755-4799
pspett@silverlaw.com

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Plaintiffs

By: */s/ Alex E. Rogers*
Alex E. Rogers, Esq. (PA #71043)
Counsel for Plaintiffs

**VERIFICATION**

I, H. Edward Carr, hereby verify that the foregoing Complaint is based on information furnished to counsel, which information has been gathered by counsel in the course of this lawsuit; that the language of the Complaint is that of counsel and not of signer; that the Complaint, subject to inadvertent or undiscovered errors, is based upon and therefore limited by the records and information still in existence, presently recollected, and thus far discovered in the preparation of this Complaint; to the extent that the contents of the pleadings are that of counsel, the undersigned has relied upon counsel in making this verification; that subject to the limitations set forth therein, the averments of the Complaint are true and correct to the best of my knowledge, information and belief. I understand that this statement is made subject to the penalties of 18 Pa. C.S.A. Sec. 4904 relating to unsworn falsification to authorities.

*/s/H. Edward Carr*
H. Edward Carr

Dated: April 28, 2026

**VERIFICATION**

I, Daniel McAuley, Jr., hereby verify that the foregoing Complaint is based on information furnished to counsel, which information has been gathered by counsel in the course of this lawsuit; that the language of the Complaint is that of counsel and not of signer; that the Complaint, subject to inadvertent or undiscovered errors, is based upon and therefore limited by the records and information still in existence, presently recollected, and thus far discovered in the preparation of this Complaint; to the extent that the contents of the pleadings are that of counsel, the undersigned has relied upon counsel in making this verification; that subject to the limitations set forth therein, the averments of the Complaint are true and correct to the best of my knowledge, information and belief. I understand that this statement is made subject to the penalties of 18 Pa. C.S.A. Sec. 4904 relating to unsworn falsification to authorities.

*/s/Daniel McAuley, Jr.*
Daniel McAuley, Jr.

Dated: April 28, 2026

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

# VERIFICATION

I, James Oestreich, hereby verify that the foregoing Complaint is based on information furnished to counsel, which information has been gathered by counsel in the course of this lawsuit; that the language of the Complaint is that of counsel and not of signer; that the Complaint, subject to inadvertent or undiscovered errors, is based upon and therefore limited by the records and information still in existence, presently recollected, and thus far discovered in the preparation of this Complaint; to the extent that the contents of the pleadings are that of counsel, the undersigned has relied upon counsel in making this verification; that subject to the limitations set forth therein, the averments of the Complaint are true and correct to the best of my knowledge, information and belief. I understand that this statement is made subject to the penalties of 18 Pa. C.S.A. Sec. 4904 relating to unsworn falsification to authorities.

*/s/James Oestreich*
James Oestreich

Dated: April 28, 2026

## VERIFICATION

I, Tigran Kalaydzhyan, hereby verify that the foregoing Complaint is based on information furnished to counsel, which information has been gathered by counsel in the course of this lawsuit; that the language of the Complaint is that of counsel and not of signer; that the Complaint, subject to inadvertent or undiscovered errors, is based upon and therefore limited by the records and information still in existence, presently recollected, and thus far discovered in the preparation of this Complaint; to the extent that the contents of the pleadings are that of counsel, the undersigned has relied upon counsel in making this verification; that subject to the limitations set forth therein, the averments of the Complaint are true and correct to the best of my knowledge, information and belief. I understand that this statement is made subject to the penalties of 18 Pa. C.S.A. Sec. 4904 relating to unsworn falsification to authorities.

*/s/Tigran Kalaydzhyan*
Tigran Kalaydzhyan

Dated: April 28, 2026

Lancaster County Prothonotary E-Filed - 28 Apr 2026 08:19:32 PM
Case Number: CI-26-03025

**Alex E. Rogers, Esq. (PA ID #71043)**
**425 New Commerce Boulevard**
**Wilkes-Barre, PA 18706**
**P: 570-262-8250**
**E: arogers@bedwickandjones.com**
**Counsel for Plaintiffs**

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY**
**CIVIL ACTION – LAW**

| | |
|---|---|
| Daniel McAuley, H. Edward Carr, James Oestreich, and Tigran Kalaydzhyan individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Pathward, National Association, f/k/a MetaBank<br><br>Defendant. | No.<br><br>Jury Trial Demanded |

## NOTICE TO DEFEND

YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claim set forth in the following pages, you must take action within twenty (20) days after this Complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED RATE OR NO FEE.

Lancaster Bar Association Lawyer Referral Service
28 East Orange Street
Lancaster, PA 17602
P: 717-393-0737

MidPenn Legal Services
153 East King Street
Lancaster, PA 17602
P: 800-326-9177

Respectfully,

/s/ Alex E. Rogers
Alex E. Rogers, Esq. (PA ID #71043)
425 New Commerce Boulevard
Wilkes-Barre, PA 18706
P: 570-262-8250
E-mail: arogers@bedwickandjones.com

Counsel for Plaintiffs